IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

BRUCE W. PEARSON,                    )
                                     )
        Plaintiff,                   )
                                     )
    v.                               )        1:19-cv-1543 (LMB/TCB)
                                     )
PRINCE WILLIAM COUNTY SCHOOL         )
    BOARD,                           )
                                     )
        Defendant.                   )

## MEMORANDUM OPINION

On December 6, 2019, plaintiff Bruce W. Pearson ("plaintiff" or "Pearson") filed the

pending complaint against the Prince William County School Board ("defendant" or the "School

Board") for racial discrimination (Count I) and retaliation (Count II) [Dkt. No. 1]. On June 4,

2020, plaintiff's attorney withdrew from representation and plaintiff has since proceeded pro se.

Plaintiff and defendant have each filed a Motion for Summary Judgment [Dkt. Nos. 41, 42], both

of which have been fully briefed.[1] Finding that oral argument would not assist the decisional

process, the motions will be decided on the papers submitted. For the reasons that follow,

defendant's Motion for Summary Judgment [Dkt. No. 41] will be granted, plaintiff's Motion for

Summary Judgment [Dkt. No. 42] will be denied, and judgment will be entered in favor of

defendant.

---

[1] Pearson's combined Motion for Summary Judgment and Memorandum of Law in Support of Motion for Summary Judgment totals 67 pages, and his opposition brief totals 44 pages. Although as the defendant correctly points out plaintiff's pleadings exceed the page limits set by the Eastern District of Virginia Local Civil Rules, Pearson's pleadings have been considered in their entirety because of his pro se status.

## I. BACKGROUND

### A. **Procedural History**

On June 10, 2019, Pearson filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging Title VII violations based on race discrimination and retaliation.[2] [Dkt. No. 1] ¶ 6; [Dkt. No. 1-1]. On or about September 10, 2019, Pearson received a Dismissal and Notice of Rights giving him 90 days to commence a civil action. Id. ¶ 7; [Dkt. No. 1-2]. In his timely filed two count Complaint, Pearson contends in Count I that the defendant subjected him to discrimination "because of his race and the race of his students," by denying his requests for field trips in April 2017 and April 2018 for his "at risk students," placing him on administrative leave with pay, requiring him to undergo a Fitness for Duty Evaluation ("FFDE"), and terminating his employment. [Dkt. No. 1] ¶¶ 12–13, 15, 22. In Count II, plaintiff alleges that being placed on administrative leave, required to undergo an FFDE, and ultimately being terminated from employment were done in retaliation for his engaging in protected activities. [Dkt. No. 1] ¶¶ 25–42.

### B. **Factual Background**

Although plaintiff disputes multiple facts, he has not properly objected to defendant's proffered uncontested facts by pointing to actual evidence in the record rather than just his arguments. The Court must "generally consider self-serving opinions without objective corroboration not significantly probative," such that a plaintiff's uncorroborated opinions and statements may be struck and disregarded as irrelevant. Evans v. Tech. Applications & Serv. Co.,

---

[2] Although Pearson amended his EEOC complaint to include a claim of religious discrimination, he has neither raised religious discrimination in his complaint nor sought leave to file an amended complaint. Accordingly, only the racial discrimination claims alleged in plaintiff's December 6, 2019 complaint are properly before the Court.

80 F.3d 954, 962 (4th Cir. 1996). To the extent that plaintiff's arguments rely on his beliefs, which are without factual foundation, they do not create a genuine issue of material fact.[3] Accordingly, the Court accepts the following facts as uncontested.

Pearson, who is a Black man, worked as a Business Teacher under a contract of employment with the School Board at Freedom Senior High School ("FHS")'s Career and Technical Education Department, after having been hired by the School Board in November 2005. Def. Ex. B, Decl. of Donna Eagle ¶ 8, Ex. 2 (PW12, 13, 1316, 1317, 1318) ("Eagle Decl."); [Dkt. No. 1] ¶ 10. Inez Bryant ("Principal Bryant"), who is Black, became FHS's principal in 2006 and was in that position at all times relevant to plaintiff's claims. Def. Ex. C, Decl. of Inez Bryant ¶¶ 3–4 ("Bryant Decl."). Christi Feemster ("Feemster"), who is Black, was an FHS Assistant Principal and directly supervised Pearson. Def. Ex. D, Decl. of Christi Feemster ¶¶ 3–4, 8 ("Feemster Decl."). At FHS, over 95% of students identify as non-white racial minorities (approximately 28% Black), and approximately 60% of the teachers identify as non-white racial minorities (approximately 30% Black). Eagle Decl. ¶ 14, Ex. 4. Since the 2019–2020 school year, FHS has been designated as a Title I school based on nearly 78% of its students being eligible for a free or reduced lunch. See Eagle Decl. ¶ 15; Bryant Decl. ¶ 6; see also Deposition Transcript of Bruce Pearson (hereinafter "Pearson Tr.") 174:25–175:2.

In his complaint, Pearson alleges that defendant discriminated against him and his "at risk"[4] students by refusing to allow transportation for his students to attend the Virginia Governor's Economics Challenge state championship in 2017 and 2018 after they won the

---

[3] Defendant also points out that plaintiff attempts to rely on documents that were not produced during discovery. The Court may only consider materials in the record and therefore cannot consider any materials not produced during discovery. Fed. R. Civ. P. 56(c)(3).

[4] Pearson testified that he defines "at risk students" as students who attend a Title I school. See Pearson Tr. 46:2–4, 173:22–24.

regional competition both years. [Dkt. No. 1] ¶ 13. The School Board has no records of a field trip request from Pearson in April 2017 or April 2018. Eagle Decl. ¶ 71, Ex. 39 (PW1508–1530, 1452– 1497); Bryant Decl. ¶ 24. The School Board does have a record of an April 2018 request for transportation to an economic state championship that was made by Jennifer McNeil ("McNeil").[5] Eagle Decl. ¶ 72, Ex. 40 (PW1502). Ultimately, this 2018 trip was cancelled due to the lack of available transportation. Pearson Tr. 47:22–48:13 ("Q. What was the reason provided to you for the denials? A. Transportation is not available that early in the morning and there were not [sic] bus transportation available, school bus transportation."). Records show that FHS facilitates hundreds of field trips each year, many of which are routinely cancelled. Bryant Decl. ¶ 25, Ex. E (PW1508-1530, 1452-1497, 1502).

In June 2018, Pearson emailed Tanisha Holland ("Holland"), the School Board's Officer of Compliance and Equity, to initiate a discrimination claim consistent with School Board policy, although he did not identify any facts in support of his discrimination claim at that time. Def. Ex. E, Decl. of Tanisha Holland ¶¶ 6, 8, Exs. A–B (PW614–618; PW35–39) ("Holland Decl."). Holland attempted to meet with Pearson to receive and begin investigating his discrimination claims, but they never met because of Holland's sudden need for personal leave. See Holland Decl. ¶ 8.

Pearson's problems with the defendant began when, on October 1, 2018, Pearson sent an unsolicited email (the "October 1 Email") to Principal Bryant, Assistant Principal Feemster, and numerous other administrators and security officers, entitled "The Truth About My Personal Life," in which he shared his belief that he was under surveillance by numerous government

---

[5] Pearson has admitted that he asked another Black teacher, Jennifer McNeil ("McNeil"), to chaperone the 2018 trip in his place, purportedly to ensure his students could attend. Pearson Tr. 48:24–49:17; Def. Ex. L, Decl. of Jennifer McNeil ¶ 6 ("McNeil Decl.").

officials and law enforcement. Plaintiff described these officials as attempting to discredit him

for his then-pending divorce proceedings to protect one of their own, who Pearson believed was

having an extramarital affair with his spouse. Bryant Decl. ¶ 8, Ex. A; Feemster Decl. ¶ 9, Ex. 1

(PW17–20). In nearly three pages, plaintiff claimed:

> I have legal standing to file an at-fault divorce complaint. Once filed paramours (cheaters) will become known publicly to several individuals and their families. Fairfax County government do [sic] not want this to happen because one of the paramours is a married white man with a family who works for Fairfax County government. Fairfax County government simply dislikes the fact I have legal leverage over potential defendants; . . . . They thought they could use their tremendous power and influence to crush me into oblivion. . . .

> FCP intentionally and willfully misinterpreted marriage communications that was [sic] designed for my spouse and her paramours' [sic] consumption only and turned it into a criminal investigation of my person. They have legal authority to violate my privacy with impunity but obtained it deceitfully. Even a novice attorney could easily figure out their true intent and purpose. FCP apparently was of the mistaken view I had engaged in unlawful videotaping of a nonconsenting adult or at least they were certain they could substantiate I am involved in an extramarital affair to mitigate the impending at-fault divorce filing. . . .
> . . .
> FCP have [sic] access to everything about me and found absolutely nothing of legal consequence. They are tracking my cell phone after deploying Hailstorm or Stingray technology which means they know where I am always, they have accessed all emails, text messages, all social media, dating sites, home phone records, regular mail, they check my garbage, and they even checked with my neighbors regarding visitors to my home, dating habits, and found absolutely nothing on all counts. They are all completely dumbfounded they haven't found anything after they officially started tracking me on or about March 12, 2018. I am not speaking about tracking by just FCP, but my name has been placed in the national police databank and every local and state police, including Prince William County are on the lookout; they found nothing. . . .

> . . . I was about to file for divorce in 2017 when my estranged spouse advised she had cancer. After failing repeatedly to get her to return to Mass before cancer was discovered, I told her God was going to punish her for betraying our marriage and family for some "onion rings and a thrill." . . .
> . . .
> . . . By the way, just because law enforcement changed their primary stalking and harassment stripes or tactics to have VDOT, Fairfax Water, Animal Control, Fire Department, other county agencies, etc., watch me, it is still government stalking and harassment. My state-of-the-art front and rear dashcam does not lie.

> Yes, I am keeping meticulous detail of everything happening untoward against me on campus and off; I have for years. [sic]
>
> For example, I saw three (3) administrators in the hallway near Freedom's enclosed cafeteria on Monday, September 24, 2018 around 12:15 PM; it was obvious they had been watching all the students flocking to the Eagles Branch enthusiastically during the annual bank opening. <u>I am confident administrators and security are watching me trying to pinpoint any involvement with a student, so they can use it to notify police; good luck with that.</u> After 14 years of dedicated public service none of you have a clue about me. As I . . . was walking to class, I said to two (2) of the administrators as one administrator left as I was approaching, "Don't believe the hype," meaning don't fall for all the things law enforcement are saying about me; one of the administrators bent over laughing uncontrollably as I continued walking in Christ. God will deal with her long-term discriminatory animus levied against me over many years; it is just a matter of time. . . .

Bryant Decl. ¶ 8, Ex. A (emphasis added). Later that month, on October 24, 2018, Pearson sent

Feemster an email titled "Classroom Monitoring and Distractions" with an attached draft letter

(the "October 24 Email") alleging that students from another teacher's class were engaged in a

"coordinated effort" to impermissibly take pictures of him and his students:

> For the past several weeks, my classes have been disturbed by your photography and art students seeking pictures and/or videos inside my classes during instruction and at other times; they even disturb me during lunch. While my classroom is a popular place for student engagement, I've noticed the interruptions occur during certain class periods or times or when specific students are present; this appears to be a coordinated effort.
>
> On Tuesday, October 23, 2018, I observed one (1) student appearing to take pictures of another student outside my class while a third student was obviously taking pictures or videos inside my 7th period class while trying without success to act incognito. I inquired of the students their intent and purpose at which time they stated the photos was [sic] part of your photography class project. These students then left suddenly.

Feemster Decl. ¶¶ 10–11, Ex. 2 (PW64–67); Bryant Decl. ¶ 10.

In November 2018, Pearson wrote to Holland again requesting a meeting and

complaining of:

- Black-on-Black discrimination by the principal, FHS and the student activities director and most assuredly others; [sic] displays bias in favor of White people and others in relation to me which has no place in a 21st Century workplace; they tend to allow their misplaced or unfounded personal animosities and emotions to interfere with what is right or fair

- Conspiracy to misrepresent or impede work performance, academic achievement, and career success
- Inappropriate use of certificated staff in administrative capacities against my person
- Creating an intimidating and hostile work environment to include continuous classroom surveillance via normal methods and via garret

Holland Decl. ¶ 10, Ex. C (PW865–870). No meeting occurred because Pearson advised Holland

that he decided to file a charge directly with the Equal Employment Opportunity Commission

("EEOC"). Holland Decl. ¶ 11, Ex. C. After Pearson's withdrawal of his November 2018 request

to meet with Holland, she reached out to Principal Bryant directly, who forwarded the October 1

and October 24 emails to Holland on November 16, 2018. See Holland Decl. ¶ 13–15, Exs. D–E

(PW17–20, 64–67).

On December 3, 2018, Holland conferred with her supervisor Amy White ("White"),

Associate Superintendent for Human Resources, and Michael Mulgrew ("Mulgrew"), Associate

Superintendent for High Schools, to explore the possibility of a "management referral" to

address Pearson's behavior, which was becoming increasingly worrisome to administrators. A

management referral refers employees to available resources, such as the School Board's

employee assistance program ("EAP"). All three have provided declarations that they believed a

management referral was necessary because of concerns about the potential negative impact

Pearson's communications and implausible, conspiratorial beliefs might have on students, his

colleagues, and school operations. Holland Decl., ¶ 16, Ex. F (PW48–52); Def. Ex. F, Decl. of

Amilene "Amy" Aviles White ¶ 12, 14, Ex. 4 ("White Decl."); Def. Ex. G, Decl. of Michael

"Mickey" Mulgrew ¶ 5, 8, Ex. 1 ("Mulgrew Decl."). While these officials were considering how

to handle Pearson, he sent an email to the FHS Director of Student Activities, Steve Bryson

("Bryson"), in response to an email Bryson had sent to all staff alerting them of an upcoming

football game. Pearson's email, which he also sent to Feemster, stated:

> Make sure they get the transportation they need as it certainly wasn't what you did for students who excelled academically and had an opportunity to win the Virginia Governors' Economic State Championship and possibly the national economic championship 2-years in a row. I will never forget the look and shock in those students [sic] eyes; you and others will have to live with that for life, and I shall make sure it is documented legally starting with the already filed EEOC charge.[6]

Feemster Decl., Ex. 3.

While the management referral was being considered, Bryson forwarded that email to

Feemster. On January 7, 2019, Pearson sent Feemster an email (the "January 7 Email") titled

"Follow-Up and EEOC Charge," in which he wrote, "I regret it has come to this, but it is what it

is…" Feemster Decl. ¶ 15, Ex. 4; Bryant Decl. ¶ 16, Ex. D (PW1018–1025). Attached to that

email was a seven-page memorandum, in which he wrote, among other things:

> . . . This is an update to the October 1, 2018 email to administrators and security personnel. . . .
>
> Do you think law enforcement reduced or increased their unwarranted surveillance since the above referenced email? You're right, they increased it tremendously. However, their results are the same; no return on their taxpayer funded investment. They were out in force over the Christmas holidays trying to save face for their tremendous legal and overzealous blunder of assuming I was guilty of something. The October 1, 2018 email shocked them to their core. Now, law enforcement and PWCS are scrambling trying desperately to wipe everything clean by pretending I am doing something they know full well is a figment of their racist imagination.
>
> The only way for them to squirm out of their self-inflicted legal conundrum is they find me with an underage student to justify their illegal surveillance. . . .
>
> . . . They do not have a crumb of legal evidence, except for those iMessage's I sent to my estranged wife and indirectly her paramours for psychological warfare purposes; I was relentless in the approach. Yes, the privacy rights lawsuit; it's coming!
> . . .
> . . . God placed me in this role because He knows I have the pedigree to tell it like it is always. I will not shy herein.
>
> . . . Law enforcement and Inez Bryant have awakened a sleeping giant. I am a God-fearing, non-confrontational or turn the other cheek type person until my rights are

---

[6] There is no evidence in the record that plaintiff had actually filed a charge with the EEOC at that time.

summarily and repeated violated. With the EEOC charge already filed,[7] we are going to
be at this for years to come.

. . .

One day shortly after closing the bank, I was walking to class near the wall by the
cafeteria to help with balance issues. I was startled by heavy footsteps and when I looked
up there was Robert Schraml rumbling down the hallway like a bull on my side of the
hall; it was as if he was going to bang into me; there was no one else in the hallway but
us; he came so close I felt a slight breeze as he passed. I suspect (knew) his purpose was
to intimidate and scare me, but I walk by faith not by fright. I cannot prove it, but I am
certain a few administrators and/or security were watching and enjoying his bullying
tactics via live camera feed. I still don't know why he would do such a thing. He
continued doing numerous other things on behalf of the principal as I have chronicled in
my extremely detailed report to the EEOC; I will be shocked if the EEOC do [sic] not
refer several of my allegations to other watchdog agencies.

. . .

. . . I no longer drink and haven't for approaching a year now. When you suspect your
wife is a cheater is one thing, but when you find out for sure that is another thing
altogether; so, I did drink for a little while trying to cope, but never at work. I am back to
my non-drinking self and on legal offense.

I told the principal I was not a drinker, but did drink with my son; she said, I know that
you don't drink, which was a flat out lie to my face as I suspect (know) the police
informed her I was purchasing alcohol and she sought to get me fired for drinking on the
job; she had all administrators and others trying to smell me; I documented every
attempt . . .

If you have a teacher who has worked for nearly 14 years and you know he does not
drink or smoke and never heard anyone say that he drinks, what should an administrator
do when someone tells them that he is drinking or smell of alcohol. It seems to me that
would be indicative of a problem and a caring principal would have called that teacher in
and say [sic] I am getting these reports of you drinking and this is not indicative of your
character. [sic] it should be asked what is going on or is there anything I should know
about or can I help. . . . This is another form of her flat-out discrimination and "out to get
me" approach.

. . .

. . . God is using me as His instrument to place a spotlight on privacy rights, corruption
and abuse of power in local and state government, law enforcement, and our school
system. There is nothing any of you can do to me that God cannot handle and is handling.

Id.

---

[7] Although plaintiff refers to an "already filed" EEOC charge, there is no evidence in the record
that plaintiff filed such a charge; the defendant's evidence is that the only EEOC charge ever
served on defendant was plaintiff's June 10, 2019 charge. See infra, note 11.

On or about January 8, 2019, the school placed Pearson on paid administrative leave pending a fitness for duty evaluation ("FFDE") through the school's EAP provider, ComPysch Corporation ("ComPsych"), as a condition of his continued employment. White Decl. ¶ 18, Ex. 8); Mulgrew Decl. ¶ 11, Ex. 6 (PW78). 34. For privacy reasons, the school does not communicate directly with medical providers regarding the treatment of School Board employees and instead utilizes ComPsych as its third-party EAP provider to monitor compliance with EAP referrals and any subsequent treatments that constitute conditions for the employee's return to work. Eagle Decl. ¶ 21; Def. Ex. J, Decl. of Elisa Pickette ¶ 8 ("Pickette Decl."). From the date of the FFDE referral and for months thereafter, Pearson wrote numerous letters to White and Dr. Donna Eagle ("Eagle"), Ed. D., Director of Human Resources for Prince William County School Board, objecting to the FFDE referral and expressing his belief that defendant was engaged in a conspiracy to surveil him. White Decl. ¶ 21, Ex. 9 (PW90–94, 991–995); Eagle Decl. ¶ 25, Ex. 13 (PW103–105).

On January 12, 2019, Pearson met with Dr. Ronnie Zuessman, PhD, the licensed clinical psychologist whom ComPsych assigned to perform the FFDE. Despite meeting for one hour, Pearson refused to sign the authorization form to permit Dr. Zuessman to complete the FFDE. Deposition Transcript of Dr. Ronnie Zuessman, Ex. K 23:5–24:6 (June 8, 2020), Exs. 7–8 (ZUESSMAN 34, 76) (hereinafter "Zuessman Tr."). As a result, Eagle notified Pearson on January 17, 2019 that failing to authorize Dr. Zuessman to complete the FFDE constituted non-compliance, which could result in a recommendation that he be dismissed from his employment, and directed him to sign the required authorization and schedule another appointment via ComPsych by January 22, 2019. Eagle Decl. ¶ 24, Ex. 11 (PW97–98). In her letter, Eagle referenced School Board Regulation 514-1, which authorizes the School Division to require

FFDEs for employees if there is good cause for such referral. Eagle Decl. ¶ 24, Ex. 12 (PW99–100). On January 18, 2019, Pearson wrote to Eagle objecting to the FFDE, but nevertheless agreeing to participate. Eagle Decl. ¶ 25, Ex. 13 (PW103–105).

On January 19, 2019, Pearson signed the necessary authorization and met with Dr. Zuessman. Zuessman Tr. 24:18–25:23, Ex. 9 (ZUESSMAN50). The completed FFDE was faxed to Eagle on or about February 1, 2019. Eagle Decl. ¶ 28, Ex. 15 (PW124- 132); Zuessman Tr. 61:25–62:15, Ex. 23 (ZUESSMAN 5–6, 64–71) (the "Zuessman Report"). In his report, Dr. Zuessman concluded that Pearson was "currently experiencing a delusional disorder" and that

> A major concern about Pearson is his ability to maintain appropriate boundaries; the persecutory delusional system has expanded across the major aspects of his life. This includes the workplace. Based upon his belief system and interpretation of events and interpersonal interactions, Pearson has acted upon the urge to communicate his internal process to others. The presence of mental disorder is having some impact upon job related relationships. Pearson also has already acted upon the urge to communicate his internal process to other staff at work, and there appears to be some risk of him communicating some of those beliefs to students. The nature of a delusional disorder would make it somewhat difficult for an individual to acknowledge its presence, as it would run contrary to their belief system. However, if the individual was willing to accept psychiatric treatment informed by this evaluation, which would include regular psychotherapy and possibly medication, they could potentially exercise control over appropriate boundaries.

Zuessman Report ¶¶ 28, 30–32. The Zuessman Report suggested that Pearson could return to work if he agreed to:

> A)   Not communicate any of his personal beliefs to students;
> B)   Demonstrate active engagement with psychiatric treatment; and
> C)   Intermittent supervision by an appointed Prince William County Public Schools professional certified in administration and supervision.

Zuessman Report ¶ 33. Defendant has offered uncontroverted expert testimony that the Zuessman Report was prepared appropriately and reasonably, and that the diagnosis of a delusional disorder and corresponding recommendations regarding Pearson's treatment as a condition of returning to work were also appropriate and justified. Def. Ex. I, Decl. of Ryan S.

11

Shugarman, M.D., DFAPA ("Dr. Shugarman") and attached Expert Opinion, at 17–24 ("Shugarman Opinion").[8]

After Dr. Zuessman faxed his report to Eagle, he received a letter from Pearson on February 2, 2019, dated January 28, 2019, in which Pearson objected again to the FFDE and wrote "I hereby revoke this FFDE authorization form as soon as you obtain necessary documents, or your report is finalized." Zuessman Tr. 88:14–89:1, 129:3–9, Ex. 16 (ZUESSMAN55-62). On February 13, 2019, Eagle, along with other human resources ("HR") personnel, met with Pearson. White Decl. ¶¶ 23–24; Eagle Decl. ¶¶ 34–35, Ex. 16; Holland Decl. ¶¶ 21–22, Ex. H; Pickette Decl. ¶ 11–12, Ex. C (PW1055–1057). During that meeting, Eagle provided Pearson with a copy of the Zuessman Report, and offered to return Pearson to the classroom on the condition that he follow the three actions suggested by Dr. Zuessman, including that Pearson authorize ComPsych to monitor his psychiatric treatment for compliance purposes. Id. Pearson agreed to all of the conditions, and he returned to his teaching job at FHS on February 14, 2019. Id. These conditions were set forth in a letter delivered to Pearson during the meeting (the "February 13 Conditional Return to Work Letter"), which Pearson signed under a statement that "My signature below indicates that I have read and understood the contents of this letter." Id.

Later that day, Pearson wrote to Eagle and admitted "I intentionally did not share what I know to Ronnie Zuessman, PhD." and again referenced the EEOC, stating that he had a meeting with the EEOC the next day and that he had previously filed a discrimination inquiry with the EEOC on February 4, 2019, concerning disability discrimination. Eagle Decl. ¶ 36, Ex. 17 (PW 139-140). In response, on February 13, 2019, Holland wrote to Pearson to notify him that the

_____

[8] Plaintiff has not offered any expert mental health evidence rebutting that report.

defendant had not received any EEOC charges as of that date. Holland Decl. ¶ 23, Ex. I

(PW143–144). Pearson wrote back two days later on February 15, 2019, admitting that he had

"decided to cancel the EEOC discrimination inquiry and start anew as I have done so many times

before; there will not be a charge forthcoming nor will I pursue a legal remedy in the future."

Holland Decl. ¶ 23, Ex. I (PW143–144).

By March 6, 2019, Pearson had failed to demonstrate active engagement with psychiatric

treatment. On that date, Eagle wrote to Pearson to remind him of his responsibility to

demonstrate his compliance with psychiatric treatment as set forth in the February 13

Conditional Return to Work Letter and set a March 18, 2019 deadline to start treatment via

ComPsych. Eagle Decl. ¶ 39, Ex. 20 (PW177–178). On March 13, 2019, Pearson sent Eagle

multiple emails, in which he again alluded to being harassed by law enforcement, challenged the

FFDE, refused to seek psychiatric counseling, and repeated that he had terminated his EEOC

complaint. Eagle Decl. ¶ 43, Ex. 21 (PW179–180). He also requested another meeting with

Eagle to discuss his return to work conditions. Eagle Decl. ¶ 44, Ex. 22 (PW181). In this request,

he added that he had "penciled in" an appointment with a counselor for March 25, 2019 and that

he had previously cancelled a prior appointment because of obligations related to Standards of

Learning testing. Id. Four days later, on March 17, 2019, Pearson informed Holland that he had

filed an EEOC charge pursuant to the Americans with Disabilities Act.[9] See Holland Decl. ¶ 24,

Ex. J (PW182–183).

Eagle learned from ComPsych that as of March 21, 2019 Pearson had not scheduled an

appointment to start psychiatric treatment. As a result, on March 21, 2019, Eagle, along with

another HR staff member, met with Pearson to remind him again of the obligations in the

---

[9]  Again, there is no evidence of that charge being served on the defendant.

February 13 Conditional Return to Work Letter. Eagle Decl. ¶¶ 45–46, Ex. 23; Pickette Decl. ¶ 14–15 (PW217– 222); Pearson Tr. 102:12–104:3. In a letter provided to Pearson during that meeting, Eagle notified him that he would be removed from the classroom and returned to paid administrative leave until he complied with the treatment plan, and that further non-compliance would subject him to disciplinary action pursuant to School Board Regulation 572-1, a copy of which was provided to him. Id. ¶ 47. That same day, Pearson sent Eagle and another HR staff member a 2-page letter objecting to his placement on administrative leave and taking issue with the EAP not offering psychiatric treatment services. Eagle Decl. ¶ 48, Ex. 24; Pickette Decl. 16, Ex. E (PW207–210).

On March 26, 2019, Eagle wrote to Pearson that he had to "demonstrate active engagement with psychiatric treatment" and that it was not the School Board's responsibility to pay for the cost of medical or psychiatric treatment. Eagle Decl. ¶ 50, Ex. 25 (PW223). She further reminded him of the risk of disciplinary action should he continue to remain out of compliance. Id. Although Pearson failed to obtain treatment by a psychiatrist, on April 2, 2019, ComPsych confirmed that he was attending appointments with a mental health counselor who was not a psychiatrist.[10] Eagle Decl. ¶¶ 49, 52, Ex. 26 (PW274); Pearson Tr. 96:21–23; Pickette Decl. ¶ 18. On April 4, 2019, at Pearson's request, Eagle and another HR staff member met with Pearson, who continued to object to the Zuessman Report, claiming the School Division

---

[10] Pearson has argued that "psychiatric treatment" was unclear. Defendant interpreted the Zuessman Report's reference to "psychiatric treatment" to require that Pearson demonstrate treatment with a psychiatrist, as opposed to a mental health professional trained in psychotherapy. White Decl. ¶ 26; Eagle Decl. ¶ 51, Ex. 26; Pickette Decl. ¶ 17, Ex. F (PW274– 278). Defendant even attempted to clarify the meaning of "psychiatric treatment" from Dr. Zuessman but was unable to because Pearson had revoked his authorization, which meant that Dr. Zuessman could not communicate with defendant's personnel. Eagle Decl. ¶ 58, Ex. 31. Dr. Zuessman later testified that he had intended for Pearson to seek treatment by a psychiatrist, and not merely to receive psychotherapy counseling. Zuessman Tr. 114:24–115:6.

"collaborated with the handpicked psychologist and ComPsych," and stating, "I will not see a psychiatrist as I advised in no uncertain terms at our last meeting, so keep digging." Eagle Decl. ¶ 53, Ex. 27; Pickette Decl. ¶ 19, Ex. G (PW309–310, 311–312). During that meeting, Pearson reiterated his belief that people were in the ceiling of his classroom surveilling him, and he stated his belief that this surveillance was limited to the classrooms of Black teachers. Eagle Decl. ¶ 55; Pickette Decl. ¶ 21. Pearson later added that he heard "farts" coming from the ceiling. Pearson Tr. 159:8

On or about April 30, 2019, Pearson sent an 11-page letter to White entitled "Sex, Lies, and Videotape—A True Story Update" (the "April 30 Letter"), in which, among other things, he renewed his delusional claims about school officials conspiring against him and continued to complain about having to see a psychiatrist and actions by law enforcement. White Decl. ¶ 27, Ex. 13 (PW332–343). Throughout his April 30 Letter, Pearson also, again, provided unsolicited information about his personal life, including problems with his estranged wife:

> Law enforcement, in particular Fairfax County police, got involved in my personal life on or about March 12, 2018 when they had reason to believe a crime may have been committed from my text messages to my estranged spouse; I led my estranged spouse and her paramour to believe I had made a video recording of her Boar's Head Inn hotel room in Charlottesville, Virginia in July 2017. Since I was in the hotel room for a brief period, the assertion was very plausible. I also led my estranged spouse to believe I was going to mail the videotape to her tryst's spouse. Law enforcement and private investigators subsequently tracked me religiously every time I went to mail a package to the post office; it is all on videotape.
>
> Law enforcement also believed my text message accounts to my spouse that I had a 91-pound former gymnast that I sneak into and out of my home through my vehicle trunk. This was all a charade; my drama queen spouse knew this was not true and that I would never do such a thing. . . .
>
> You may be wondering why I chose a 91-pound former gymnast as someone I was seeing as a figment of my imagination to irk my serially unfaithful spouse. My spouse always chided me from the very beginning of my employment at Freedom that I liked teaching those young, hard bodies. She would say those were her best years as she liked when she

was 89-91-pounds. My spouse is a drama queen. She must be the center of attention wherever she is.

Id. at 338–39.

On May 2, 2019, White met with, and delivered to, Pearson a letter advising him that pursuant to School Board Regulation 572-1 (Disciplinary Action), she would recommend that his employment with the School Board be terminated based on his unfitness for duty (evidenced by his letters demonstrating persistent delusions) and noncompliance with his work conditions, as set forth in the February 13 Conditional Return to Work Letter and in Eagle's numerous letters and meetings with plaintiff. White Decl. ¶¶ 29–31, Ex. 14 (PW344–349). In her May 2 letter, White also highlighted ComPsych's confirmation that Pearson had revoked his authorization for Dr. Zuessman to share information with the School Division, which prevented the School Division from confirming Pearson's compliance. Id. ¶ 30. Pearson signed the May 2 letter under protest Id. ¶ 29, Ex. 14; Pearson Tr. 139:16–23.

On May 20, 2019, Associate Superintendent Mulgrew wrote to Pearson notifying him that he had decided to recommend to the Superintendent that Pearson's employment be terminated based on his insubordination and unfitness for duty. Mulgrew Decl. ¶¶ 22–25, Ex. 13 (PW356–358). On May 23, 2019, Pearson wrote to Mulgrew seeking more "clarification" about the Zuessman Report and finally offering to reauthorize Dr. Zuessman to clarify his meaning of "psychiatric treatment." Mulgrew Decl. ¶ 27, Ex. 15 (PW362–364). Mulgrew proceeded to forward his recommendation to the superintendent, and on May 30, 2019, the superintendent formally provided Pearson with a Notice of Proposed Dismissal, along with a copy of the applicable grievance procedure. Mulgrew Decl. ¶ 29, Ex. 16; Eagle Decl. ¶ 64, Ex. 35 (PW365–383).

16

Pearson initiated a grievance under the State Grievance Procedure for Teachers, which was received by the School Division on June 17, 2019. White Decl. ¶ 35, Ex. 17 (PW385–386). As part of that procedure, White offered to meet with Pearson regarding the reasons for the dismissal recommendation. White Decl. ¶ 36 (PW909). Pearson declined to meet with White, and the grievance hearing never occurred because Pearson withdrew his grievance. White Decl. ¶ 37, Ex. 19 (PW909–912); Pearson Tr. 156:17–157:2. On June 10, 2019, Pearson filed an EEOC charge, which defendant received on June 26, 2019.[11] Eagle Decl. ¶ 66, Ex. 36; Holland Decl. ¶ 27, Ex. K (PW407–415).

---

[11] Pearson testified that his EEOC Complaint was filed in February 2019, but that "there was a government shutdown and all kind of things going on at that time, and EEOC had a long timeline to get to the EEOC charge processing." Pearson Tr. 157:13–25. There is no evidence in the record supporting that claim. The EEOC charge bears June 10, 2019 as the date plaintiff signed it, and that charge is the only one ever served on defendant. Holland Decl. ¶ 27, Ex. K (PW407–415).

In his memorandum in support of his Motion for Summary Judgment, Pearson states that he:

> filed or initiated three (3) complaints with the EEOC on November 25, 2018 (harassment and discrimination (PTBE 17)), February 4, 2019 (retaliation (PTBE 40)), and August 1, 2019 (religious discrimination which included allegations of Freedom of Speech violations), see Exhibit 3, Amended Charge of Discrimination. Since the Defendant continued discriminating and retaliating, I was forced to protect my constitutional and civil rights and invoked the Opposition and Participation Clause of Title VII which ultimately resulted in two (2) formal Charges of Discrimination filed with the EEOC alleging violations of Title VII including violations based on race discrimination and retaliation filed on June 10, 2019 (PTBE 89) and a Charge for Religious Discrimination with allegations of constitutional rights violations filed on August 1, 2019, see Exhibit 3.

[Dkt. No. 43] ¶ 2. Defendant objects that none of the referenced exhibits were produced in discovery, making them inadmissible. [Dkt. No. 79] ¶ 2. The November 2018 and February 2019 EEOC complaints that plaintiff cites to are from "Plaintiffs [sic] Trial Binder Exhibits" submitted prematurely to the Court on July 6, 2020, and appear to be EEOC inquiries, not formal complaints. Based on Pearson's communications to Holland about withdrawing these initial inquiries, Pearson's statement actually supports the interpretation that he first filed an EEOC charge on June 10, 2019, which is also the only EEOC charge that defendant ever received.

Accordingly, there is no evidence in the record that any EEOC charges were filed other than the one filed on June 10, 2019.

On September 4, 2019, the School Board approved the Superintendent's recommendation and terminated Pearson's employment. Eagle Decl. ¶ 67, Ex. 38 (PW1400–1407). Pearson's teaching position was temporarily filled by a Black male teacher and later permanently filled by a Black female teacher. Bryant Decl. ¶ 21; Feemster Decl. ¶ 21.

## II. DISCUSSION

### A.  **Standard of Review**

In the Fourth Circuit, summary judgment is appropriate where "there is no genuine issue as to any material fact and … the movant is entitled to judgment as a matter of law." Norfolk S. Ry. Co. v. City of Alexandria, 608 F.3d 150, 156 (4th Cir. 2010) (quoting Fed. R. Civ. P. 56). A genuine dispute about a material fact exists if "after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012). All inferences must be made in favor of the nonmoving party. Hawkins v. McMillan, 670 F. App'x 167, 168 (4th Cir. 2016). Where there are cross-motions for summary judgment, a court "consider[s] and rule[s] upon each party's motion separately to determine whether summary judgment is appropriate as to each." Monumental Paving & Excavating, Inc. v. Penn. Mfrs. Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999). A party cannot defeat summary judgment by only offering unsupported opinions and conclusions, nor can summary judgment be defeated by simply arguing that a party needs the opportunity to cross examine witnesses. A party survives summary judgment by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

**B. Analysis**

    1. Racial discrimination

      To establish a prima facie case for discrimination based on race, a plaintiff may use direct or circumstantial evidence. In the absence of direct evidence, the burden-shifting framework of McDonnell Douglas Corp. v. Green governs the allocation of proof. 411 U.S. 792 (1973). Because Pearson has not provided any direct evidence that any of defendant's actions were based on his race, he must support his claims with circumstantial evidence under the McDonnell-Douglas framework, which provides that: (1) plaintiff must first establish a prima facie case of discrimination; (2) if he does, then the employer must articulate a legitimate, nondiscriminatory reason for its actions; and (3) in order to prevail, plaintiff must establish that the employer's articulated legitimate, nondiscriminatory reason was a pretext to mask unlawful discrimination. Id. at 802–04; see, e.g., Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (applying the McDonnell-Douglas framework).

      "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dep't Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). "Liability . . . 'depends on whether the protected trait . . . actually motivated the employer's decision.'" Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003) (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)). The elements Pearson must prove to provide a prima facie case of race discrimination under Title VII are: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment than similarly-situated employees outside protected class" or that "the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination." Coleman v. Md. Court of Appeals, 626 F.3d

187, 190 (4th Cir. 2010); Jones v. Constellation Energy Projects & Servs. Grp., Inc., 629 F.

App'x 466, 468 (4th Cir. 2015) (quoting Adams v. Trs. of the Univ. of N.C.–Wilmington, 640

F.3d 550, 558 (4th Cir. 2011)). In cases where a plaintiff contends that he suffered a

discriminatory discharge, the Fourth Circuit also requires proof "that the position was filled

by a similarly qualified applicant outside the protected class." See King v. Rumsfeld, 328 F.3d

145, 149 (4th Cir. 2003).

      In Count I, plaintiff broadly alleges racial discrimination focusing on four incidents: (1)

the denial of his April 2017 and 2018 field trip requests, (2) his placement on paid administrative

leave, (3) his referral for an FFDE, and (4) his termination. Although plaintiff meets the first

element because he is Black, none of the incidents aside from termination are adverse

employment actions. An actionable adverse employment action requires proof of "a significant

change in employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in benefits."

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (citations omitted). The field trip

denials are not adverse employment actions because plaintiff suffered no harm to his

employment status or pay.[12] Courts do "not sit as a kind of super-personnel department weighing

the prudence of employment decisions made by firms charged with employment discrimination."

---

[12] Additionally, the alleged denials of plaintiff's April 2017 and 2018 field trips are time-barred. Title VII requires a plaintiff to exhaust administrative remedies before bringing suit by timely filing a charge of discrimination with the EEOC. See 42 U.S.C. § 2000e-5(e)(1) (Title VII); 42 U.S.C. § 12117(a) (applying Title VII remedies). In Virginia, a charge of discrimination must be filed within 300 days of the alleged act of discrimination. See Ghebreab v. Inova Health Sys., No. 1:16-CV-1088, 2017 WL 1520427, at *6 (E.D. Va. Apr. 26, 2017). "Only claims stated in the initial EEOC charge or those reasonably related to them may be maintained in a subsequent lawsuit." Henderson v. Fairfax-Falls Church Community Serv. Bd., No. 1:18-CV-825, 2018 WL 6037522, at *3 (E.D. Va. Nov. 15, 2018). Pearson filed his charge with the EEOC on June 10, 2019. Accordingly, his claims may only extend back 300 days, to August 14, 2018; however, because defendant did not raise this issue, the Court will evaluate the claim on the merits.

DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998). Although plaintiff may have been upset by the field trip denials, they are not actionable under law. Even if the field trip denials were an adverse employment action, defendant has provided uncontroverted evidence that it has no records of a field trip request from plaintiff in April 2017 or April 2018. Decl. ¶ 71, Ex. 39 (PW1508–1530, 1452–1497); Bryant Decl. ¶ 24. Moreover, assuming that McNeil's April 2018 field trip request was on Pearson's behalf, the evidence in the record shows it was denied because of lack of available transportation, a fact which plaintiff admits.[13] Pearson Tr. 47:22–48:13.

Similarly, being placed on paid administrative leave and referred for an FFDE were not adverse employment actions. Courts have generally held that an employer's placement of an employee on paid leave pending an investigation and requiring an employee to submit to a fitness for duty examination are not materially adverse employment actions under Title VII. Nichols v. S. Ill. Univ.-Edwardsville, 510 F.3d 772, 786-87 (7th Cir. 2007) (administrative leave to undergo an FFDE without impact to position, salary, or benefits did not constitute a materially adverse action); Lacasse v. Didlake, Inc., 194 F. Supp. 3d 494, 504 (E.D. Va. 2016), subsequently aff'd, 712 F. App'x 231 (4th Cir. 2018) ("Paid leave is not an adverse employment action.") (citing Von Gunten v. Maryland, 243 F.3d 858, 869 (4th Cir. 2001),

---

[13] Plaintiff relies on Exhibit 10 to his memorandum in opposition to defendant's Motion for Summary Judgment [Dkt. No. 81], but this exhibit is his own correspondence with coordinators of the economic state championship and is inadmissible. Defendant also points out that it was not produced in discovery. Even if this exhibit were admissible, it only confirms that the field trip request was denied because of lack of available transportation, as Pearson writes in the email that he received an email from the transportation department explaining bus timing issues and informing him that "[u]nfortuantely I do not have the resources to fulfill this request." Plaintiff has provided no evidence other than his own arguments that the field trip requests were denied "because of continuous discrimination and retaliation against me by the principal and student activities director." [Dkt. No. 81] ¶ 35.

abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)); see also Schoffstall v. Henderson, 223 F.3d 818, 825-26 (8th Cir. 2000) (FFDE not an adverse action for discrimination or retaliation); Harrison v. City of Akron, 43 F. App'x 903, 905 (6th Cir. 2002) (holding that "[p]sychological examinations . . . are not adverse actions") (citing Benningfield v. City of Houston, 157 F.3d 369, 376 (5th Cir. 1998)). "The simple fact of being subjected to a medical examination is not per se degrading or humiliating . . . ." Baker v. Potter, No. 02-cv-525, 2005 WL 843169, at *12 (N.D. Ill. Jan. 20, 2005) (granting employer summary judgment), aff'd, 153 F. App'x 393 (7th Cir. 2005). Plaintiff was placed on paid administrative leave pending the FFDE referral and received no loss of pay during that time. Even if these actions were adverse employment actions, Pearson's emails evincing increasing paranoia and lack of boundaries were sufficiently concerning for defendant to refer him for an FFDE and place him on paid administrative leave. Moreover, defendant has provided uncontroverted evidence that it has not singled out Black employees for referral for an FFDE. In fact, the majority of such referrals have been for white employees.[14] Accordingly, plaintiff has not met his burden of providing evidence that either his placement on paid administrative leave or referral for an FFDE was racially motivated.

Although being terminated does qualify as an adverse employment action, Pearson has not established the other elements of a prima facie case of discriminatory discharge from employment. As to the second element, defendant "does not dispute Pearson's prior history of positive work performance evaluations as a Business Teacher in the classroom"; however, as defendant argues, "plaintiff's increasingly disturbing communications that began in October

---

[14] Eagle explained that since July 1, 2017, six white employees, one Asian employee, one multi-racial employee, and two Black employees (including Pearson) have been referred for FFDEs. Eagle Decl. ¶ 76, Ex. 43.

2018 called into question Pearson's effectiveness, particularly with respect to his ability to

develop and maintain working relationships with his coworkers and supervisors and the

trustworthiness of his judgment regarding appropriate boundaries, especially with students."

[Dkt. No. 44] at 22. The record shows that Pearson's emails raised valid concerns about his

ability to maintain appropriate boundaries and working relationships, as his emails accused a

coworker and students of participating in a "coordinated effort" of taking unauthorized pictures

of his classroom and students, and raised conspiratorial beliefs about surveillance by school

employees. Bryant Decl. ¶ 8, Exs. A, B, D. These emails, sent not only to his supervisors but

also to other employees, raised valid concerns for the School Board about whether Pearson's

paranoid thinking would be shared with his students. Id. Accordingly, Pearson has not

established the satisfactory job performance element of a prima facie case of discriminatory

discharge from employment.

Additionally, plaintiff has not shown that the position was filled by a similarly

qualified applicant outside his protected class. See King v. Rumsfeld, 328 F.3d 145, 149 (4th

Cir. 2003). After plaintiff was fired, he was replaced temporarily and then permanently by

Black teachers. Bryant Decl. ¶ 21; Feemster Decl. ¶ 21. Pearson has offered no facts to refute

this evidence. Additionally, plaintiff has not provided any evidence of similarly situated white

(or other non-Black) employees who were treated more favorably than he was treated. In

particular, as to his termination, since the 2017–2018 school year, the School Board has

terminated the employment of fifteen white employees, two Asian employees, and four Black

employees (including Pearson). Eagle Decl. ¶ 77, Ex. 44 (PW1504–1507). Accordingly,

plaintiff has not established a prima facie case of racial discrimination.

Even if the Court were to find that Pearson established a prima facie case of discrimination, the School Board has provided more than sufficient evidence that the decisions to place plaintiff on paid administrative leave, refer him for an FFDE, and terminate his employment were made for a legitimate non-discriminatory reason. A court's purview when reviewing an employer's reasoning is narrow:

> Our sole concern is whether the reason for which the defendant discharged the plaintiff was discriminatory. Thus, when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.

DeJarnette, 133 F.3d at 299. Pearson's emails were clearly inappropriate and raised legitimate concerns about his mental stability and his lack of boundaries with co-workers and potentially with students. After providing plaintiff with multiple opportunities over several months to remain in his teaching position, plaintiff failed to comply with the required mental health treatment. Moreover, rather than using the established grievance procedure to challenge the recommendation that he be terminated, Pearson continued to submit copious writings which only confirmed that he was still experiencing the same delusional disorder that had originally raised defendant's concerns and warranted the referral to the FFDE. Accordingly, defendant has met its burden of production that the decisions to place plaintiff on paid administrative leave, refer him for an FFDE, and ultimately terminate his employment were for legitimate non-discriminatory reasons.

Pearson has not shown that this explanation was a pretext for discrimination. All he has submitted are self-serving statements which are insufficient to create a genuine disputed issue of material fact. There is no dispute that Pearson authored and sent the numerous emails that caused school officials to become concerned about his mental stability. The danger that he would share

24

his delusional beliefs with students and the need for him to maintain collaborative working relationships with the school more than justified defendant's referral of Pearson to an FFDE and the subsequent requirement that he obtain psychiatric treatment.[15] The School Board's expert, Dr. Shugarman, provided an uncontroverted opinion that Pearson's subsequent correspondence was consistent with Dr. Zuessman's diagnosis that Pearson was experiencing a delusional disorder. Def. Ex. I, Shugarman Opinion, at 6–16. Plaintiff has offered no expert opinion to refute either Dr. Shugarman or Dr. Zuessman's opinions, and the evidence in the record clearly supports this diagnosis. See, e.g., Bryant Decl., Exs. A, B, C, D; White Decl., Ex. 13. Accordingly, plaintiff has failed to provide any evidence creating a factual dispute as to whether defendant's proffered reasons for its actions towards plaintiff were pretextual.

    2. Retaliation

In Count II, plaintiff broadly alleges three incidents as the basis for his retaliation claim: (1) his placement on paid administrative leave, (2) the referral for an FFDE and (2) his termination. "The elements of a prima facie retaliation claim under Title VII are: (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." Coleman, 626 F.3d at 190. Pearson must prove "but-for" causation, which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013). As the Supreme Court has stated, "[e]mployers need not suspend previously planned transfers upon discovering that" protected activity has

---

[15] Pearson's objection to the meaning of the phrase "psychiatric treatment" is unavailing, as he had months to clarify the meaning of this phrase with Dr. Zuessman. The School Board's requirement that Pearson see a psychiatrist was justified based on the language contained in the Zuessman Report, and in fact Dr. Zuessman himself later confirmed that interpretation. Zuessman Tr. 114:24–115:6.

occurred, and employers "proceeding along lines previously contemplated, though not yet

definitively determined, is no evidence whatever of causality." Clark Cty. Sch. Dist. v. Breeden,

532 U.S. 268, 272 (2001). Defendant disputes, and the record does not show, that Pearson

engaged in any protected activity before June 2019.[16] The record establishes that defendant was

already discussing an FFDE referral based on plaintiff's October emails by at least early

December 2018, and the FFDE referral was officially made in January 2019. Accordingly,

plaintiff has not produced any evidence that would support a finding that the defendant's

decisions to refer plaintiff for an FFDE and place him on paid administrative leave pending the

FFDE were causally connected to his filing a charge with the EEOC in June 2019.

As to plaintiff's termination, the record establishes that at least as early as March 21,

2019, plaintiff was notified by Eagle that further non-compliance with the treatment plan would

subject him to disciplinary action. Eagle Decl. ¶ 47. Eagle warned plaintiff again on March 26,

2019 that he would be subject to disciplinary action if he did not comply with the treatment plan.

Id. ¶ 50. After Pearson continued to refuse to meet with a psychiatrist, Eagle recommended to

White—who accepted that recommendation—that Pearson's employment be terminated. Id. ¶

61. White met with Pearson on May 2, 2019 to notify him that she was recommending his

termination. Id. ¶¶ 61–62, Ex. 33; White Decl. ¶¶ 29–32, Ex. 14. On May 20, 2019, Mulgrew

notified Pearson that Mulgrew had decided to recommend to the Superintendent that Pearson's

employment be terminated. Mulgrew Decl. ¶¶ 22–25, Ex. 13. On May 30, 2019, Superintendent

Walts formally provided Pearson with a Notice of Proposed Dismissal. See Mulgrew Decl. ¶ 29,

Ex. 16; Eagle Decl. ¶ 64, Ex. 35. Although the final decision to terminate plaintiff was made on

September 4, 2019, almost three months after Pearson filed his EEOC charge on June 10, 2019,

---

[16] See supra, note 11.

that plan began months before plaintiff filed his EEOC complaint and therefore, as <u>Clark County</u> makes clear, the termination was merely the culmination of defendant's "previously contemplated" plan. Accordingly, Pearson cannot prove but-for causation.

Even if the Court found that plaintiff engaged in informal protected activity before June 2019, Pearson must establish causation by proving that he would not have been placed on paid administrative leave, referred for an FFDE, and ultimately discharged from employment but for retaliation. <u>See</u> <u>Nassar</u>, 570 U.S. at 343. As discussed above, the School Board was fully justified in referring plaintiff for an FFDE and in finding that Pearson was insubordinate and unfit for duty. School Board administrators met with plaintiff multiple times to explain the steps necessary to keep his job and gave plaintiff multiple chances over the course of almost three months to do so. The types of emails that plaintiff was sending to administrators and colleagues were clearly inappropriate and of legitimate concern to the School Board. Additionally, it is uncontested that plaintiff failed to comply with the directive to see a psychiatrist. Accordingly, Pearson has failed to produce sufficient evidence from which a reasonable factfinder could conclude that the decisions to place him on paid administrative leave, refer him for an FFDE, and terminate his employment were motivated by a retaliatory animus. Moreover, defendants have provided sufficient unrebutted evidence from which a reasonable factfinder could conclude that the reasons given for referring plaintiff to FFDE, placing him on paid administrative leave, and terminating him were not pretextual.

## III. CONCLUSION

For the reasons stated above, defendant's Motion for Summary Judgment [Dkt. No. 41] will be granted, plaintiff's Motion for Summary Judgment [Dkt. No. 42] will be denied, and judgment will be entered in favor of defendant by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 25ᵗʰ day of March, 2021.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

28